## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRADLEY CARL DEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-886-D |
| | ) | |
| STRYKER EMPLOYMENT | ) | |
| COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Stryker Employment Company, LLC's (Stryker) Motion for Summary Judgment [Doc. No. 48]. Plaintiff filed a Response [Doc. No. 58], and Stryker filed a Reply [Doc. No. 62]. The matter is fully briefed and at issue.

## BACKGROUND

Plaintiff Bradley Carl Dean spent approximately 15 years working as a sales representative (sales rep) for Stryker, while also serving as a member of the Oklahoma Army National Guard. Plaintiff's service with the National Guard required him to take leaves of absence from Stryker so that he could complete training or, on multiple occasions, active National Guard service. In addition to his military-related leave, Plaintiff also took two medical leaves of absence while working for Stryker—one as a result of injuries sustained during a non-military-related helicopter crash and one to attend in-patient rehab for alcoholism.

In December of 2021, Stryker terminated Plaintiff's employment. Stryker contends that it terminated Plaintiff after investigating, and substantiating, two actionable allegations

of Plaintiff's misconduct. Plaintiff, on the other hand, contends that Stryker actually terminated him because the company was fed up with his military and medical leave. The parties' disagreement over the real reasons underlying Plaintiff's termination forms the basis of this lawsuit, in which Plaintiff asserts two claims against Stryker: (1) a retaliation[1] claim under the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, as amended by the ADA Amendments Act of 2008 (ADA); and (2) wrongful termination on the basis of Plaintiff's military service, in violation of the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301, *et seq.* (USERRA).

Stryker seeks summary judgment in its favor with respect to both claims. For Plaintiff's ADA claim, Stryker argues that Plaintiff is not "disabled" as defined by the ADA, but, even if he were, he cannot establish a prima facie case or show that Stryker's reasons for terminating him were pretextual. And as for Plaintiff's USERRA claim, Stryker argues that Plaintiff cannot show that his military service was a substantial or motivating

---

[1] Plaintiff styles his claim as one for ADA retaliation, while Stryker contends Plaintiff's claim is actually one for ADA interference. The Court concedes that the contours of Plaintiff's claim are a bit murky, but at least two district courts within the Tenth Circuit have concluded that the "Tenth Circuit treats ADA retaliation and ADA interference claims in the same manner." *Martin v. AT&T Corp.*, 331 F. Supp. 2d 1274, 1300–01 (D. Colo. 2004) (citing *Butler v. City of Prairie Vill.*, 172 F.3d 736, 751–52 (10th Cir. 1999)); *Cohen v. Howard*, No. 23-cv-02104-LTB-SBP, 2024 WL 2137944, at *7 (D. Colo. Apr. 2, 2024) (same). Although the Court does not read *Butler* as establishing a hard-and-fast rule that ADA retaliation and interference claims are always treated the same, the Court need not resolve any conflict here. What matters for purposes of Plaintiff's ADA-based claim is determining whether there is any genuine dispute of material fact as to whether there is a causal connection between Plaintiff's alleged disability and Stryker's decision to terminate him and, assuming there is, whether Stryker's proffered legitimate, nondiscriminatory reason for terminating Plaintiff is pretextual. In the Court's view, this analysis would apply, regardless of how the claim is labeled. Therefore, the Court will refer to Plaintiff's ADA-based claim as one for retaliation.

factor in his termination, but, even if he could, Stryker had legitimate reasons for terminating Plaintiff.

## UNDISPUTED MATERIAL FACTS[2]

## I.    Plaintiff's general employment history

Plaintiff began working for Stryker—a medical technology company—in June 2006 as a sales rep in the Orthopedic Instruments unit. Plaintiff's duties consisted primarily of selling power tools, equipment, and devices for orthopedic-related surgeries. Plaintiff was regarded as a successful sales rep and received several awards and accolades for his efforts. Over his career at Stryker, Plaintiff reported to several different regional managers. From 2019 until he was terminated in December of 2021, Plaintiff reported directly to Regional Manager Laura Schroeter, who in turn reported to Kevin Steed, the Vice President of Sales for Orthopedic Instruments.

From 2006 through 2011, Plaintiff's assigned territory was all of Oklahoma, except Tulsa, and he was the only sales rep who serviced accounts or customers in that territory. By 2011, sales in Plaintiff's territory had grown to a level that merited a "territory cut," which meant that his territory was divided and a portion of it assigned to another sales rep to ensure adequate customer service. Typically, Stryker assessed business growth and the need for territory cuts at the start of every year. As business in Oklahoma continued to

---

[2] This statement includes material facts that are supported by the record and not opposed in the manner required by Fed. R. Civ. P. 56(c)(1) and LCvR56.1(d). All facts properly presented by a party and not specifically controverted by an opponent are deemed admitted, pursuant to Fed. R. Civ. P. 56(e)(2) and LCvR56.1(e). Further, any fact stated by a party that is not supported by the party's citation to the record is disregarded.

grow, Stryker instituted additional territory cuts in 2016, 2017, and 2019, assigning more sales reps to account for the growth.

## II.    Plaintiff's military leaves of absence

Plaintiff has been a member of the Oklahoma Army National Guard since 1995 and currently holds the rank of Colonel. During his time working for Stryker, and as part of his military service, Plaintiff consistently spent one weekend each month and two weeks each summer in military training. In addition to his regular training, Plaintiff took three leaves of absence for active National Guard service.

Plaintiff's first leave of absence was from May 8, 2017 through September 30, 2017. Plaintiff was initially assigned to assist with counter-drug operations in Oklahoma, but he then moved directly into assisting with Hurricane Harvey relief in Texas. Plaintiff's second leave of absence was from July 5, 2019 through September 30, 2020. Plaintiff attended the U.S. Air War College until May 2020, at which point he began work as a member of Governor Kevin Stitt's COVID Response Task Force. Plaintiff's third, and last, leave of absence came in August and September 2021 when he again helped with hurricane relief in Texas.

Regarding each military-related leave of absence, Plaintiff testified generally that Stryker's process for obtaining approval for leave was straightforward, and he had no issues requesting and obtaining the necessary approval. Plaintiff further testified that his supervisors, including Ms. Schroeter, Craig Kamphaus, and Mr. Steed, were supportive of his leave, and he had no problems returning to work at Stryker upon completing each period of leave.

4

During his leaves of absence, Plaintiff's territory was covered by other Stryker sales reps or assistant sales reps, and when he returned from leave, Plaintiff always returned to the same position he held before. During his leaves of absence, Plaintiff received compensation from the military, but Stryker paid him as well. Specifically, upon his return to work, Stryker would pay Plaintiff the difference between his military pay and his monthly average pay over his last twelve months at Stryker.

### III.    Plaintiff's medical leaves of absence

Aside from his military leaves of absence, Plaintiff also took two medical leaves of absence during his time working for Stryker. Plaintiff's first leave of absence was from May 19, 2018 through August 1, 2018 and was a result of Plaintiff sustaining injuries in a non-military-related helicopter crash.

Plaintiff's second leave of absence was from March 9, 2021 through July 11, 2021, during which he attended in-patient rehab for alcoholism. Plaintiff's friends and Stryker coworkers were the impetus behind his decision to attend rehab, and Plaintiff testified that a Stryker coworker, Ryan Campbell, and Mr. Steed took care of most of the leave-approval process on Plaintiff's behalf.

Much like his military leaves of absence, Plaintiff testified generally that Stryker's process for obtaining approval for leave was straightforward, and he had no issues requesting and obtaining the necessary approval. And when he returned to Stryker from each leave of absence, Plaintiff had no problems and returned to the same position he held before.

## IV.    Plaintiff's workplace misconduct and termination

In February 2015, Plaintiff lied during a corporate investigation about having an extramarital affair with a Stryker coworker. Eventually, a supervisor convinced Plaintiff to provide the HR[3] investigator with the truth, and he did. As a result of his dishonesty, Stryker issued Plaintiff a final written warning. Plaintiff received and signed the document, acknowledging that "failure to meet [Stryker's] expectations may result in disciplinary action, up to and including termination, at any time."

On November 1, 2021, a female Stryker sales rep informed HR that Plaintiff had made an inappropriate comment about her to a Stryker customer. After receiving this information, Stryker's Employee Relations department launched an investigation, which was led by Senior Manager Sarah Marie Puterbaugh. During the course of the investigation, three misconduct allegations against Plaintiff were substantiated: (1) the previously mentioned inappropriate comment; (2) intoxication at a Stryker dinner; and (3) sending a graphic photo to a Stryker customer that included a portion of Plaintiff's genitals. Although all three allegations were substantiated, Ms. Puterbaugh concluded that only the inappropriate comment and graphic photo were actionable.

During the investigation, Plaintiff denied making the at-issue comment, but Ms. Puterbaugh found other evidence—including an eyewitness account from another sales rep—to be more credible. Ultimately, Ms. Puterbaugh concluded that Plaintiff stated he was not interested in dating his Stryker coworker because her "tits would be up here, in my

---

[3] Although the Court doubts any confusion exists, "HR" is short-form for "human resources."

face, in my mouth area."[4] As for the graphic photo, Ms. Puterbaugh concluded that Plaintiff sent the photo and that it depicted a portion of his genitals. All told, the investigation lasted approximately one month, and Stryker interviewed eight witnesses, including Plaintiff.

After Ms. Puterbaugh concluded the investigation and generated her Investigation Summary Report, she shared her findings with Sarah Moussa, Stryker's Senior HR Business Partner for Orthopedic Instruments. Ms. Puterbaugh recommended that Plaintiff either be terminated or given a final written warning. Ms. Moussa shared the investigation results with Ms. Schroeter and Mr. Steed, along with her recommendation that Plaintiff's employment be terminated.

Ultimately, Ms. Schroeter and Mr. Steed agreed with Ms. Moussa's recommendation that Plaintiff be terminated, and, on December 13, 2021, they informed Plaintiff of their decision to terminate his employment with Stryker. Plaintiff recalls that Ms. Moussa told him he was being terminated because of the inappropriate comment and the graphic photo, and he confirmed that nobody said or did anything that would suggest his termination was motivated in any way by his military or medical leaves of absence.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is

---

[4] During his deposition, Plaintiff admitted that he lied to Ms. Puterbaugh during the investigation and acknowledged that he had, in fact, made the inappropriate comment.

genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the non-movant. *Id.* at 255.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c)(1)(A). The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

As mentioned, Stryker seeks summary judgment on Plaintiff's ADA retaliation claim, as well as his wrongful-termination claim under USERRA. The Court addresses each claim in turn and concludes that Stryker is entitled to summary judgment on both.

## I.    Stryker is entitled to summary judgment on Plaintiff's ADA retaliation claim.

The ADA prohibits retaliation in opposition to protected activity, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). The ADA also

prohibits interference with an individual's ADA rights, providing that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). As explained in footnote 1, "[t]he Tenth Circuit treats ADA retaliation and ADA interference claims in the same manner." *Cohen*, No. 2024 WL 2137944, at *7.

Where, as here, a plaintiff relies on indirect evidence to show retaliation, courts utilize the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff is first required to establish a prima facie case of retaliation, at which point "the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision." *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (abrogated on other grounds by *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166 (10th Cir. 2018)). Thereafter, the burden shifts back to the plaintiff to "proffer evidence demonstrating the employer's reason is pretextual." *Id.*

### A.    Plaintiff fails to establish a prima facie case of ADA retaliation.

To show retaliation under the ADA, Plaintiff must show: "1) [he] engaged in a protected activity; 2) [he] was subjected to adverse employment action subsequent to or contemporaneous with the protected activity; and 3) a causal connection between the protected activity and the adverse employment action." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).[5] The Court assumes without deciding that Plaintiff

---

[5] Recall, Stryker contends Plaintiff is actually alleging an ADA interference claim, not an ADA retaliation claim. Plaintiff does not address this contention, instead focusing his analysis on

has established the first two elements of his prima facie case. But Plaintiff fails to set forth specific facts tending to show a causal connection between his request for leave to treat his alcoholism and/or recover from the non-military helicopter crash and his termination. Therefore, he fails to establish a prima facie case of ADA retaliation.

An employee may show a causal connection by setting forth "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (quoting *Haynes v. Level 3 Comms., LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)). Plaintiff's last medical leave of absence was from March 9, 2021 through July 11, 2021, but Stryker did not terminate Plaintiff until December 13, 2021—approximately five months after he returned to work. Stryker Mot. Summ. J. at 25.[6] "Four months is too large a time gap to establish a causal connection." *Proctor*, 502 F.3d at 1208 (collecting cases). Common sense dictates that an additional month only further confirms that Plaintiff cannot show a causal connection based on temporal proximity alone.

Because a five-month timespan "does not support an inference of retaliatory motive, [Plaintiff] must present additional evidence to establish the necessary causal connection."

---

retaliation. The Court finds this discrepancy immaterial, as the Tenth Circuit treats both claims the same, and the parties agree on the elements Plaintiff must show to establish a prima facie case. *Compare* Stryker Mot. Summ. J. at 24 ("To [establish a prima facie ADA interference claim], Dean must show: (1) that he engaged in a protected activity under the act; (2) that Stryker took a materially adverse action against him; and (3) that a causal connection existed between the protected activity and the materially adverse action."), *with* Pl.'s Resp. at 18 ("A plaintiff can establish a prima facie of ADA retaliation case by showing: (1) protected activity; (2) adverse employment action; and (3) a causal connection between the protected activity and adverse action.").

[6] Citations to the record reference the CM/ECF page number at the top of each page.

*Id.* at 1209. On this front, Plaintiff relies on evidence that he claims shows Stryker's proffered legitimate, nondiscriminatory reason for terminating him is pretextual. *See* Pl.'s Resp. at 22. As a general matter, Plaintiff's reliance on pretext evidence in attempting to establish his prima facie case is permissible, but the Tenth Circuit has cautioned against putting the cart before the horse:

> Finally, and while we agree generally with the assertion that pretext evidence—i.e., the fact that Defendants applied the anti-nepotism policy inconsistently with regard to the Adamson family—may be useful in multiple stages of a Title VII case and may be considered under appropriate circumstances in assessing the prima facie case, we reject Plaintiffs' assertion that such evidence satisfies their individual prima facie burdens here. By conflating evidence tending to cast doubt on an employer's stated reasons for an employment decision with the burden of establishing an inference of actionable discriminatory animus in the first instance, Plaintiffs seek to gain the benefit of that inference without having to establish it. Without a demonstrable nexus between aspersions cast on an employer's stated reasons and invidious intent, evidence of "pretext" merely establishes that an employer's stated reason for its actions may not be its real or only reason. It does not establish that the real or "but-for" reason was unlawful discrimination.

*Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008) (internal citation omitted).

The *Adamson* court's reasoning is instructive here. Plaintiff relies on four categories of evidence in arguing that Stryker's legitimate, nondiscriminatory reason for terminating him is pretextual. As explained in detail below, the Court does not agree that any of those four categories support a finding of pretext. But for purposes of establishing a prima facie case, Plaintiff must present "some affirmative evidence that [his] disability was a determining factor in [Stryker's] decision to terminate [him] . . . ." *Vinez v. Sky Chefs, Inc.*, 658 F. App'x 390, 394 (10th Cir. 2016). He does not even attempt to do so. Whether

Stryker's "proffered reason was true does not alone indicate that disability was a determining factor in [Stryker's] decision to terminate [him]." *Id.*

Indeed, the record contains evidence bolstering the conclusion that Stryker supported—and proactively encouraged—Plaintiff's medical leave. *See* Dean Depo. [Doc. No. 48-1], 122:4-20 (Plaintiff agreeing that Stryker's "leaves department" provided support), 122:21-123:21 (describing email chain between Plaintiff and Mr. Steed that Plaintiff agreed was supportive). Plaintiff's pretext evidence, at least on its face, can only reasonably be interpreted as "suggest[ing] that [Stryker's] stated reason may have been untrue or inaccurate." *Vinez*, 658 F. App'x at 394.

For example, perhaps Stryker terminated Plaintiff not, as Stryker claims, because of the inappropriate comment or graphic photo, but because he was drinking too much around customers at Stryker events, in violation of company policy. Certainly, that would tend to undercut Stryker's proffered legitimate, nondiscriminatory reason for terminating Plaintiff, but it would not show that Stryker terminated him for discriminatory reasons. In other words, the record does not "suggest discrimination was a determining factor. And without more, the untruthfulness or inaccuracy of the reason does not, in and of itself, create an inference of discriminatory intent to establish a prima facie case." *Id.*

## B. Stryker has proffered a legitimate, nondiscriminatory reason for terminating Plaintiff.

Although the Court concludes that Plaintiff fails to establish a prima facie case for ADA retaliation, in the spirit of completeness, it proceeds to the second and third steps of the *McDonnell Douglas* framework. At the second step, Stryker must proffer a legitimate,

nondiscriminatory reason for its employment decision (*i.e.*, terminating Plaintiff). *See MacKenzie*, 414 F.3d at 1274.

Stryker argues it meets its burden because Plaintiff "was terminated after a thorough investigation revealed (and Dean has even admitted) that he violated Stryker's legitimate expectations—not once, but twice—in interactions with Stryker customers." Stryker Mot. Summ. J. at 26. For his part, Plaintiff does not contest that Stryker has met its burden. *See* Pl.'s Resp. at 23 ("Although Stryker has likely presented a sufficient legitimate, nondiscriminatory reason for its decision to terminate Dean . . . Dean can show that these reasons are a pretext for retaliation under the ADA.").

The Court finds that Stryker has met its burden in proffering a legitimate, nondiscriminatory reason for terminating Plaintiff: Stryker terminated Plaintiff after its investigation substantiated three instances of misconduct, two of which (the inappropriate comment and the graphic photo) it found to be actionable. Having found that Stryker meets its burden in proffering a legitimate, nondiscriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to set forth evidence showing Stryker's reason is pretextual. *See MacKenzie*, 414 F.3d at 1274.

### C. Plaintiff fails to show that Stryker's proffered legitimate, nondiscriminatory reason is pretextual.

"A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons.'" *Anderson*, 181 F.3d at 1179 (citation omitted). In determining pretext, it is not for the Court to decide whether Stryker's reasons for its decision were "wise, fair, or even correct," so long as they were truly the reasons for the decision. *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1083 (10th Cir. 1999) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)). The Court's role is "to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (quotation and citation omitted). "[A] challenge of pretext requires [courts] to look at the facts as they appear to the person making the decision to terminate [a] plaintiff." *Id.* at 1231. "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson*, 181 F.3d at 1179 (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

As mentioned previously, Plaintiff relies on four categories of evidence in arguing that Stryker's proffered legitimate, nondiscriminatory reason for terminating him is pretextual: (1) decisionmaker comments; (2) conflicting accounts; (3) investigation integrity; and (4) Stryker culture. *See* Pl.'s Resp. at 23-32; Stryker Reply at 3-10.[7] The Court addresses each category in turn.

### 1.    Decisionmaker comments

Plaintiff argues that "decisionmaker comments about [his] protected leave usage provide compelling evidence of pretext" because his "supervisors repeatedly referenced

---

[7] For ease of reference, the Court uses the category labels created by Stryker—*i.e.*, decisionmaker comments, conflicting accounts, investigation integrity, and Stryker culture.

his protected leave while expressing concerns about the performance of [his] territory," and the comments "were made by decisionmakers and specifically directed at [Plaintiff] and his protected leave." Pl.'s Resp. at 24, 25. Specifically, Plaintiff relies on comments by Ms. Moussa and Ms. Schroeter which he contends reveal "a pattern of hostility toward [his] protected leave usage that began long before the investigation that allegedly led to his termination." *Id.* at 25.

First, Plaintiff points to Ms. Moussa's notes, which were taken during two different conversations with Ms. Schroeter—one in June 2021 and the other in July 2021. Although far from clear, Ms. Moussa's notes from the June 2021 conversation appear to relate to Plaintiff's leave and how to measure his performance metrics in light of the leave taken:



Brad Dean- volunteerily of the military leave, taking advantage... knows our #
Happens year over year... oppornity in

Samella... how much leave has he taken
Benchmark, does he get a pass bch es on leave

Full year of performance since 2018...

Hasn't had a true... probably making 2018 comp

Taking normal standards into account, miss year prior, miss 2nd year... performance plan... haven't had full year performance
How should we measure his performance?
2019- hit,
2020- hit,

3 year averages...

Sarah Moussa
Senior HR Business Partner
Stryker
Orthopaedic Instruments Division
C: 551-207-1289

6/2021 Moussa Notes [Doc. No. 58-11]. Ms. Moussa's notes from her July 2021 conversation with Ms. Schroeter—which are, again, in shorthand form—appear to recount a conversation she had with Plaintiff and mentions "LOA," among other things:



Met Monday- sit down, set expectations with him
Base line- opportunity to be direct about a couple things, heard he didn't know how to use 2019 quota tool
Power BI
This is important, expectation... set you up, expect you connect with them
Quota, big year... territory, b.c of your LOA... must win, quota for you
Opportunity to do that
Support you

Good conversation- be direct

Jan 2020- September 2020, only for Q4

- Capital 2.6 million
- 1.5 mil has to do... 2 deals, he was working on LY... are now being owned by the ASC team, get him there
- Another deal that is a million

Sarah Moussa
Senior HR Business Partner
Stryker
Orthopaedic Instruments Division
C: 551.207.1289

7/2021 Moussa Notes [Doc. No. 58-12].

Second, Plaintiff points to comments Ms. Schroeter made in November 2021 during Stryker's investigation into Plaintiff's alleged instances of misconduct:

> Out of the 2 years I have been his manager, he has spent over a year of that on leave, then even times I felt like before he left, it was a distracted two years. I don't know that [I] have evidence to substantiate, but a lot of teammates are frustrated because of the way he behaves. He has told people in conversations that he knows exactly how much leave he has, almost like he is using it strategically to maximize sales opportunity but be out as much as he can. I don't know that he has been in the territory for a full quota year for 5-6 years. So, with that comes quota relief, it is so hard to know how to hold him to performance standards. I would say if you look at that territory for five years, it has underperformed because he has gotten so much quota relief. He is hard to manage in that way.

Stryker Investigation Report [Doc. No. 58-6] at 52.

"Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *McCrary v. Aurora Pub. Sch.,* 57 F. App'x 362, 367 (10th Cir. 2003). For a statement to constitute evidence of discrimination (rather than a "stray remark"), Plaintiff must also show "that there was a

nexus between the discriminatory statement[] and the decision to terminate." *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1129 (10th Cir. 1998).

Here, Stryker does not appear to contest that Ms. Moussa and Ms. Schroeter were decisionmakers, at least as it relates to Plaintiff's termination. Therefore, any argument or analysis by the parties regarding whether the notes and comments were "stray remarks" is misplaced. *See* Pl.'s Resp. at 24-25; *see also Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995) ("[A] stray remark by *someone not in a decision-making position* does not establish intent to discriminate." (emphasis added)). Instead, Plaintiff must present evidence tending to establish a nexus between the allegedly discriminatory comments and Stryker's decision to terminate him. For several reasons, the Court concludes that Plaintiff fails to do so.

First, the span of time between Ms. Moussa's notes and Plaintiff's termination weighs against any nexus between the notes and Stryker's decision to terminate Plaintiff. The notes were taken approximately six (June 2021) and five (July 2021) months before Plaintiff's termination.[8] Indeed, Ms. Moussa's notes were taken long before Stryker even received the November 2021 complaint that ultimately prompted its investigation into Plaintiff. Although not on its own dispositive, this temporal gap—especially when considered alongside the context in which the notes were taken—does not support an inference of discriminatory intent. *See Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp.

---

[8] Although to a lesser degree, the same is true for the span of time between Ms. Moussa's notes and Ms. Schroeter's comments during Stryker's investigation (approximately five months (June 2021) and four months (July 2021)), which undercuts Plaintiff's argument that the notes provide context for Ms. Schroeter's comments.

2d 1242, 1252 (D. Colo. 2012) (finding no causal nexus because, among other reasons, the at-issue statement "occurred at least a month prior to Plaintiff's termination"); *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (holding that, even assuming the at-issue remark evinced racial animus, "the remark was temporally remote from the termination").

Second, even when construed in a light most favorable to Plaintiff, no reasonable juror could find that Ms. Moussa's notes show any discriminatory animus. When viewed within the context of the notes themselves, Ms. Moussa only explicitly mentions "military leave," so it is far from clear that Ms. Moussa is even considering, or intending to reference, Plaintiff's medical leave. "In context the remark can only be taken as indicating a concern" that Plaintiff *may* be taking advantage of leave, which *may* have been impacting his sales performance. *See Angell v. Fairmount Fire Prot. Dist.*, 550 F. App'x 596, 602 (10th Cir. 2013). These ambiguous, offhand comments are not the type of decisionmaker remarks that have been held to show discriminatory animus. *See, e.g.*, *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996) ("The remarks at issue in this case were directed to the plaintiffs individually, unlike the very general statements in *Cone*."). At most, Ms. Moussa's notes can be interpreted as showing some frustration with Plaintiff potentially taking advantage of leave as a general matter. But no reasonable juror could conclude that Ms. Moussa's notes show discriminatory animus.

Although a slightly closer call, the Court reaches the same conclusion regarding Ms. Schroeter's comments. Ms. Schroeter's comments were given much closer in time to Plaintiff's termination than Ms. Moussa's notes. But even so, the context surrounding Ms.

18

Schroeter's comments does not show any sort of discriminatory animus toward Plaintiff. The question posed to Ms. Schroeter was as follows: "Anything else that I should know about Brad Dean, as an employee?" Stryker Investigation Report at 51. Ms. Schroeter states that Plaintiff told other "people in conversations that he knows exactly how much leave he has, almost like he is using it strategically to maximize sales opportunity but be out as much as he can." *Id.* at 52. Plaintiff argues that, "[g]iven [Ms.] Schroeter's documented history of discussing these exact sentiments about Dean's leave usage in conversations with Moussa, a reasonable jury could conclude Schroeter was slyly presenting her own views, hoping they would bolster the case for Stryker to act against Dean at the conclusion of the investigation." Pl.'s Resp. at 27. But as explained above, there is no such "documented history," at least any sort of history of Ms. Schroeter making comments that show discriminatory animus.

As it relates to both Ms. Moussa's notes and Ms. Schroeter's comments, the entirety of the record—which provides important context to the notes and comments Plaintiff relies on—shows Stryker was consistently supportive of, and even proactively encouraged, Plaintiff's medical leave. *See Tomsic*, 85 F.3d at 1479 (relying on the "context of the case" in considering the plaintiff's pretext evidence); *Angell*, 550 F. App'x at 602 ("In context the remark can only be taken as indicating a concern with the manner in which the loss was incurred."); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1141 (10th Cir. 2000) ("Thus, examining Seebock's comment in light of all of the evidence . . . .").

Plaintiff's first medical leave of absence was from May 19, 2018 through August 1, 2018 and was taken to recover from injuries he sustained in a helicopter crash. Dean Depo.

at 84:14-23. Plaintiff testified that he had no problems getting Stryker to approve his medical leave, his regional manager at the time was supportive, and he had no difficulties returning to work at Stryker. *See id.* at 89:16-90:19. Plaintiff testified similarly regarding his second medical leave of absence, which was from March 9, 2021 through July 11, 2021 and was taken to attend in-patient rehab for alcoholism. *See id.* at 91:9-16, 102:1-6, 121:1-122:3.

Plaintiff also testified that several Stryker coworkers, including Mr. Steed, were among those who initiated, and later facilitated, his plan to attend in-patient rehab. *See id.* at 97:18-98:11, 101:3-25. The record shows that Stryker consistently supported Plaintiff's medical leaves of absence—evidence that does not tend to establish that Stryker's proffered legitimate, nondiscriminatory reason for terminating Plaintiff was pretextual. When Ms. Moussa's notes and Ms. Schroeter's comments are considered within this broader context, no reasonable juror could conclude that their isolated remarks were the result of discriminatory animus.

At bottom, Plaintiff fails to present evidence tending to establish a nexus between Ms. Moussa's and Ms. Schroeter's allegedly discriminatory notes or comments and Stryker's decision to terminate him.

### 2.    Conflicting accounts

Plaintiff points to alleged "material inconsistencies about how the investigation began," arguing such inconsistencies show pretext:

> Moussa testified that she learned about the comments from an HR counterpart and that when she informed Schroeter, Schroeter was surprised. Indeed, as stated in Stryker's statement of facts, Moussa seemed to indicate

that the subject of Dean's comments reported them to HR. However, Schroeter testified to a completely different sequence of events—that she learned about the comments from her counterpart Julia Wilder, who called Schroeter regarding comments about Wilder's subordinate, Ashton Korona, asking what should be done. Schroeter then reported this information to Moussa. The investigation report aligns more closely with Schroeter's version, stating that the investigation was initiated upon Wilder's report, after Wilder's conversation with Schroeter. Given the previous comments about Dean's leave, any involvement from Moussa and Schroeter in the initiation of the investigation is suspect. More important, a reasonable jury could interpret Moussa's account as an attempt to hide Moussa's and Schroeter's role in initiating the investigation, from which a jury could infer pretext.

Pl.'s Resp. at 28 (internal citations omitted).

In response, Stryker contends that Plaintiff's argument is "both a mischaracterization of the testimony and a classic red herring," as neither Ms. Moussa nor Ms. Schroeter testified that they initiated the investigation:

To be clear, both Moussa and Schroeter testified that they consulted one another upon hearing that Dean made inappropriate sexual comments about a coworker to a customer. Specifically, Schroeter testified that she first discussed the matter with Julia Wilder, a fellow sales manager and the supervisor of the female employee who was the target of Dean's misconduct. She then contacted Moussa in HR because the female employee was feeling "extremely uncomfortable with [the] incident." Moussa, in contrast, recalled that she first heard of the events from her counterpart in HR. She then learned that an investigation had been opened when she was contacted by the investigator, Sarah Marie Puterbaugh, a fact which she then shared with Schroeter. More importantly, neither Moussa nor Schroeter testified that they initiated the investigation. And, in fact, Stryker's investigation report indicates that the investigation was triggered by Julia Wilder: "Reported as: Julia Wilder contacted HR on 11/1/2021 to notify of a situation regarding an OI Rep making a comment towards NS Rep."

Stryker Reply at 6-7 (internal citations omitted) (alteration in original).

To be sure, pretext can be inferred from "inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Morgan*, 108

F.3d at 1323. But minor inconsistencies "do not constitute evidence of pretext." *Hysten v.*

*Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 908 (10th Cir. 2011).

Here, Ms. Schroeter testified that she learned about Plaintiff's alleged sexual comments upon receiving a call from Julia Wilder, and, after receiving the call, she contacted Ms. Moussa and "told her about the situation." *See* Schroeter Depo. [Doc. No. 48-5] at 44:25-45:13, 134:18-135:1. Ms. Moussa, on the other hand, testified that she learned about Plaintiff's alleged sexual comments when she "received a phone call from [her] counterpart in another business unit . . . ." Moussa Depo. [Doc. No. 48-3] at 44:10-18. After she learned of the comments, Ms. Moussa "connected" with Ms. Puterbaugh and "reached out" to Ms. Schroeter to "loop her in that there was an investigation open related to the comment." *Id.* [Doc. No. 58-4] at 48:19-25. Neither individual testified that they initiated the investigation, and the Investigation Report itself indicates that the investigation began as a result of Ms. Wilder contacting HR "to notify of a situation regarding an OI Rep making a comment towards NS Rep . . . ." Stryker Investigation Report at 2.

To the extent any inconsistencies exist regarding how Ms. Schroeter and Ms. Moussa heard about Plaintiff's alleged comments, those inconsistencies do not relate to Stryker's proffered legitimate, nondiscriminatory reason for terminating Plaintiff. Stryker maintains—and has maintained— that it terminated Plaintiff as a result of the two instances of misconduct found to be actionable during its investigation. Minor inconsistencies regarding how certain individuals heard about Plaintiff's alleged misconduct, to the extent such inconsistencies even exist, do not support the inference that Stryker's proffered

legitimate, nondiscriminatory reason for terminating Plaintiff was pretextual. *See Garrett v. Hertz Corp.*, No. CIV-15-1381-W, 2017 WL 4339638, at *12 (W.D. Okla. May 17, 2017) (finding that inconsistent testimony regarding "the individual who selected [interview panelists]" is insufficient to support a finding of pretext); *Forbes v. Kinder Morgan, Inc.*, 172 F. Supp. 3d 1182, 1197 (D. Kan. 2016) ("Forbes has produced a scrupulously nitpicked handful of minor inaccuracies concerning Mask's understanding of the pre-fight events. But those pre-fight inaccuracies relate too loosely to the fight's details and not at all to Mask's decision."); *Branson v. Valu Merchandisers Co.*, No. 13–CV–2582–JWL, 2015 WL 437754, at *5 (D. Kan. Feb. 3, 2015) (finding that "testimonial contradictions" regarding who made the decision to eliminate the plaintiff's position are "insufficient to establish pretext").

### 3.    Investigation integrity

Plaintiff next points to "serious deficiencies" during Stryker's investigation, such as "a failure to gather and consider relevant evidence that could have provided critical context." Pl.'s Resp. at 29. Specifically, Plaintiff argues that Ms. Puterbaugh declined to review, or disregarded, relevant evidence that could have provided context surrounding "the photo incident." *Id.* And, according to Plaintiff, Ms. Puterbaugh failed to interview "Valerie Arnold, a key witness regarding the alleged inappropriate comments." *Id.*

Stryker, on the other hand, first emphasizes that Plaintiff "does not argue that Puterbaugh's purported failure to gather or consider relevant evidence resulted in her reaching the wrong conclusions." Stryker Reply at 8. Instead, Plaintiff's additional evidence would have purportedly only shown that the photo recipient, and the CEO of the

recipient's company, were not offended by the photo. *Id.* However, Ms. Puterbaugh testified that the additional context would not change that Plaintiff violated Stryker's policies, and Plaintiff "was afforded the opportunity to provide this additional context himself (<u>which he did</u>)." *Id.* (emphasis in original).

It is true that "shortcomings in the employer's investigation" may allow the jury to infer pretext. *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1199 (10th Cir. 2021). In analyzing an investigation in the context of a pretext analysis, however, the Court does not focus on whether the investigation is "optimal (i.e., text-book best practices)" but instead on whether it "was fair." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017). The "failure to conduct . . . a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (internal citations and quotation marks omitted).

Here, Plaintiff's argument fails for a single reason: Stryker interviewed Plaintiff as part of its investigation, during which he was asked about his version of events. *See* Stryker Investigation Report at 18-23. "[A]n employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'" *Dewitt*, 845 F.3d at 1314 (quoting *E.E.O.C. v. BCI Coca–Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)); *see also Rutledge v. Bd. of Cnty. Comm'rs of Johnson Cnty., Kan.*, No. 20-2012-DDC-GEB, 2022 WL 910724, at *19 (D. Kan. Mar. 29, 2022) ("Ms. Klamm interviewed plaintiff. She got his side of the story. Under

our Circuit's precedent, that fact alone defeats an inference of pretext based on an allegedly flawed investigation.").

Even assuming that allowing Plaintiff to give his version of events doesn't totally sink his argument, Plaintiff's alleged deficiencies in the investigation do not render the investigation unfair. On this front, Plaintiff's reliance on *Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008) and *Ibrahim* is misplaced. In *Trujillo*, although the plaintiffs had "served PacifiCorp for 28 years, they were never given the benefit of the doubt during the investigation. Rather, the company seemingly relied only on evidence to the detriment of the [plaintiffs] and failed to interview key witnesses." 524 F.3d at 1160.

In *Ibrahim*, Alliance fired Dr. Erfan Ibrahim—a Muslim man of Pakistani descent— for his "inappropriate comments to two women." *Ibrahim*, 994 F.3d at 1195. Upon learning of the comments, Alliance conducted an "investigation," which "consisted solely of asking Dr. Ibrahim what he had said to the member of the U.K. delegation. Dr. Ibrahim admitted what he had said, and Alliance fired him." *Id.* at 1200.

Unlike *Trujillo* and *Ibrahim*, no reasonable juror could conclude that Stryker failed to conduct a fair investigation. Plaintiff argues that Stryker refused to consider the context surrounding the photo incident, which would have shown that the photo was not sexual in nature and that the recipient was not offended. *See* Pl.'s Resp. at 29. But Stryker did consider that context. Indeed, Ms. Puterbaugh testified that Plaintiff told her the photo was not intended to be sexual in nature: "[H]e did not intend for [the photo] to be -- I think his phrase was 'There was no sexual aim to it.' He stated this." Puterbaugh Depo. [Doc. No. 48-4] at 51:19-24.

25

Whether Stryker refused to give Plaintiff's comments the weight he thinks they deserved, or whether Stryker's investigation generally could have been better, is irrelevant. What matters for purposes of the Court's pretext analysis is whether Stryker's investigation was fair, and the record confirms that it was. *See Dewitt*, 845 F.3d at 1315 ("Our focus here is not on whether SWBTC's investigation was optimal (i.e., text-book best practices); rather, it is on whether its investigation was fair."); *see also Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1083 (10th Cir. 2023) ("[F]or an inference of pretext to arise on the basis of a procedural irregularity, there must be some evidence that the irregularity *directly and uniquely disadvantaged [the employee]*." (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1176 (10th Cir. 2013) (emphasis in original))).

### 4.    Stryker culture

Plaintiff last argues he was the victim of "selective enforcement" because he was "terminated for making crude comments and sharing an inappropriate photo," all the while Stryker maintained a "locker room" culture where similar transgressions often resulted in lesser discipline. Pl.'s Resp. at 30. Plaintiff relies primarily on declarations from Yance Vaughn and Bruce Bartlett, two former Stryker employees, who each state that Stryker had a "locker room" culture—a culture that Ms. Schroeter witnessed and tolerated. *See* Vaughn Decl. [Doc. No. 58-13]; Bartlett Decl. [Doc. No. 58-14].

In response, Stryker argues neither Mr. Vaugh nor Mr. Bartlett provide "details about what they purportedly heard, when, or from whom; and neither of them provides a basis to suggest they are competent to testify about Schroeter's alleged observations." Stryker Reply at 9. Further, neither individual "suggests that they witnessed sexually harassing

comments directed to or about a coworker that went unchecked; neither of them suggests that any of the conduct they allegedly witnessed resulted in a harassment report to HR that was ignored; and neither of them suggests that they had ever witnessed this sort of conduct with customers." *Id.* at 9-10.

Plaintiff can show pretext "by providing evidence that he was treated differently from other *similarly-situated* employees who violated work rules of comparable seriousness." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 718 (10th Cir. 2014) (quoting *Kendrick*, 220 F.3d at 1231) (emphasis in original). "To establish that a comparison employee is similarly situated, the plaintiff must show 'the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Id.* (quoting *Kendrick*, 220 F.3d at 1232).

Here, Plaintiff makes no genuine attempt to show that similarly situated Stryker employees were treated differently for their violations of Stryker's rules. Instead, he sets forth evidence purportedly showing that Stryker had a "locker room" culture where distasteful comments regularly went unpunished. Even if it is true that Stryker had some sort of "locker room" culture, the vague assertions in Mr. Vaughn's and Mr. Bartlett's declarations fall well short of showing that *similarly situated* Stryker employees were treated differently than Plaintiff.[9]

---

[9] Notably, Plaintiff's evidence addresses only half of Stryker's proffered legitimate, nondiscriminatory reason for terminating him—*i.e.*, he does not set forth any evidence regarding whether, or how, Stryker disciplined other employees who sent photos of their genitalia (whether intentionally or not) to customers.

Indeed, neither Mr. Vaughn nor Mr. Bartlett reference any other Stryker employee, any specific comments made by other Stryker employees, to whom any comments were directed, or whether anyone reported any comments to Stryker's HR department. Instead, Mr. Vaughn and Mr. Bartlett merely state that, during their time working for Stryker, they witnessed behavior that leads them to believe that Plaintiff was terminated for discriminatory reasons. Without more (indeed, much more), Plaintiff's generalized assertions regarding a "locker room" culture do not support the inference that Stryker's proffered legitimate, nondiscriminatory reason for terminating Plaintiff is pretextual.[10]

## II.    Stryker is entitled to summary judgment on Plaintiff's USERRA claim.

"USERRA prohibits employers from terminating service-members based on their membership in or obligations to the armed services." *Starr v. QuikTrip Corp.*, 655 F. App'x 642, 645 (10th Cir. 2016) (citing 38 U.S.C. § 4311(a)). An employee bringing a claim under USERRA "bear[s] the initial burden of showing by a preponderance of the evidence that [his or her] military service was a substantial or motivating factor in the adverse employment action." *Lewis v. Rite of Passage, Inc.*, 217 F. App'x 785, 786 (10th Cir. 2007)

---

[10] Plaintiff's reliance on *Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir. 1990) is misplaced. In *Spulak*, a constructive-discharge case, the court affirmed the district court's denial of the defendant's "motion for j.n.o.v." *Id.* at 1153. In so doing, the court referenced various trial evidence supporting the jury's verdict for the plaintiff. *Id.* at 1153-54. Part of that evidence included "evidence that using the back door and failing to sign in and out were widespread policy violations that did not ordinarily precipitate a loss prevention investigation or a written reprimand." *Id.* at 1154. This evidence, among all of the other evidence the court discussed, was "sufficient to support a jury finding that Spulak was singled out for unduly harsh and discriminatory treatment, and that he was given an ultimatum either to retire or be fired." *Id.* However, the court was not conducting a pretext analysis, and its conclusion rested upon the totality of the trial evidence, not a single piece. Here, even if *Spulak* were instructive, Plaintiff falls well short of setting forth the type, and volume, of evidence set forth by the plaintiff in *Spulak*.

(alteration in original). Military status "is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Id.*

If the employee can make this initial showing, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* "[O]nce the employee establishes that his or her military service was a substantial or motivating factor in the adverse employment action, both the burden of production and the burden of persuasion shift to the employer." *Id.* at 786-87.

### A.    Plaintiff fails to carry his burden of showing that his military service was a substantial or motivating factor in Stryker's decision to terminate him.

To satisfy his initial burden in showing that his military service was a substantial or motivating factor in Stryker's decision to terminate him, Plaintiff may present evidence of the following:

> [1] [P]roximity in time between the employee's military activity and the adverse employment action, [2] inconsistencies between the proffered reason and other actions of the employer, [3] an employer's expressed hostility toward members protected by the statute together with knowledge of the employee's military activity, and [4] disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Sellman v. Aviation Training Consulting, LLC*, No. CIV-22-365-D, 2023 WL 5987215, at *4 (W.D. Okla. Sept. 14, 2023) (quoting *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009)).

Here, each of the above factors is either neutral or cuts against Plaintiff. First, and similar to the Court's discussion above in relation to Plaintiff's ADA claim, the three-month gap between the end of Plaintiff's last military leave of absence and his termination weighs

against Plaintiff. *See Angell*, 907 F. Supp. 2d at 1252; *Antonio,* 458 F.3d at 1183. Plaintiff attempts to reframe the time period as the gap between the end of his last military leave of absence and the initiation of Stryker's investigation. *See* Pl.'s Resp. at 33. But the relevant time period is the gap between the end of Plaintiff's last military leave of absence and "the adverse employment action." *See Sellman*, 2023 WL 5987215, at *4. Even Plaintiff concedes that his termination is the "adverse employment action" at issue, not the initiation of Stryker's investigation. *See* Pl.'s Resp. at 18 ("Dean experienced an adverse employment action when he was fired.").

Second, and for the same reasons discussed in relation to Plaintiff's ADA pretext arguments, there are no material inconsistencies between Stryker's reason for terminating Plaintiff and its other relevant actions. Stryker terminated Plaintiff because he made an inappropriate comment to a Stryker customer regarding a coworker's breasts, and he sent a photo to a Stryker customer that included a portion of his genitals. The purported inconsistencies Plaintiff identifies in his argument that Stryker's reason for terminating him was pretextual—which he adopts for purposes of his USERRA claim—do not show any sort of anti-military animus.

Third, and for largely the same reasons discussed in relation to Plaintiff's ADA pretext arguments, Plaintiff fails to set forth any evidence showing Stryker's expressed hostility toward Plaintiff's military service. Plaintiff argues there is "direct evidence of expressed hostility toward [his] military service from the key decisionmakers . . . ." Pl.'s Resp. at 34. The Court assumes Plaintiff is referencing Ms. Moussa's notes and Ms. Schroeter's comments, which, again, can only fairly be described as ambiguous, isolated,

and not showing any anti-military animus. But even if Ms. Moussa's notes and Ms. Schroeter's comments can be considered insensitive, "they do not unambiguously express an anti-military sentiment." *Starr*, 655 F. App'x at 646. This is especially true when considering relevant context and the evidence as a whole, both of which show Stryker's continuous support for Plaintiff's military service. *See Porter v. Trans State Holdings, Inc.*, No. 1:23-cv-00263-SBP, 2024 WL 4710633, at *12 (D. Colo. Nov. 7, 2024) (finding insufficient to support any inference of military hostility a statement that the plaintiff did "a lot of military duty").

Fourth, and for the same reasons discussed in relation to Plaintiff's ADA pretext arguments, Plaintiff fails to set forth evidence showing he was treated differently than other similarly situated Stryker employees. The vague assertions in Mr. Vaughn's and Mr. Bartlett's declarations do nothing to change that.[11]

---

[11] To the extent Plaintiff also relies on Nathan Miersma's testimony, it does not change the Court's conclusion. Mr. Miersma testified, in relevant part: "[O]n at least a couple of occasions I heard comments about [Plaintiff's] absence and what I'll call lamentations about having to -- you know, it's protected, there's nothing we can do about it." Miersma Depo., [Doc. No. 58-10] at 46:20-24. But Mr. Miersma could not identify any specific comments, who made them, or to whom they were made. As best as he could remember, Mr. Miersma testified that he remembered comments being made while Plaintiff was on leave "flying missions for the Drug Enforcement Agency" and while he was "attending . . . War College." *Id.* at 50:21-51:10. Setting aside Mr. Miersma's failure to identify any specifics surrounding the alleged comments, Plaintiff's last military leave of absence ended in September 2021, which was approximately three months before Stryker terminated Plaintiff. This lack of temporal proximity—on top of the lack of any specific details— undercuts any argument that the comments Mr. Miersma allegedly heard unambiguously showed anti-military sentiment.

**B.    Stryker carries its burden of showing that legitimate reasons, standing alone, would have led to Plaintiff's termination.**

Even assuming Plaintiff carried his initial burden in showing that his military service was a substantial or motivating factor in Stryker's decision to terminate him, Stryker carries its burden in showing that legitimate reasons, standing alone, would have induced it to terminate Plaintiff. Upon receiving a complaint that Plaintiff had made an inappropriate comment to a customer about a coworker's breasts, Stryker investigated the allegation. During its month-long investigation, Stryker substantiated three allegations of misconduct against Plaintiff, but only two were found to be actionable: (1) the inappropriate comment about a coworker's breasts; and (2) the photo Plaintiff sent to a customer, which included a portion of his genitals. Although he denied making the inappropriate comment when he was interviewed as part of the investigation, Plaintiff has since admitted to both instances of misconduct.

Ultimately, Stryker concluded that Plaintiff violated its expectations, policies, and values, and that termination was warranted. "The decision to terminate turned on the fact that Dean had acted inappropriately not once, but twice, in direct interactions with Stryker customers and the fact that Dean had already received a final written warning previously." Stryker Mot. Summ. J. at 17. Although Plaintiff contends Stryker's stated reasons for terminating him are not its actual reasons, the Court has thoroughly addressed Plaintiff's purported evidence on that front and finds it insufficient to support any finding of pretext. Stryker's reasons for terminating Plaintiff, standing alone, would have led to Plaintiff's

termination, regardless of his military service. No rational trier of fact could conclude otherwise.

## CONCLUSION

For these reasons, the Court finds that Stryker is entitled to summary judgment on Plaintiff's ADA retaliation claim, as well as his USERRA claim.

**IT IS THEREFORE ORDERED** that Stryker's Motion for Summary Judgment [Doc. No. 48] is **GRANTED**. A separate judgment shall be entered accordingly.

**IT IS SO ORDERED** this 13th day of June, 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge